UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DAILYPAY, LLC,<br><br>       Plaintiff,<br><br>    v.<br><br>ATTORNEY GENERAL LETITIA JAMES, in her official capacity as the Attorney General of the State of New York,<br><br>       Defendant. | Case No. 25-CV-2849<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff DailyPay, LLC ("DailyPay"), by and through its undersigned counsel, brings this action for declaratory relief against the New York Office of Attorney General (the "OAG") for its threatened enforcement under federal and state laws. DailyPay alleges as follows:

## PRELIMINARY STATEMENT

1.     Most workers in New York are subject to an antiquated payroll process, under which they must wait weeks to receive pay they already have worked for and earned. The payroll schedule, most often bi-weekly, is a remnant of the past when employers processed pay and deductions manually. Thanks to technological advances, a deferred pay schedule no longer is necessary. Yet workers continue to face the costs of a payroll schedule that does not line up with their bills and other obligations. As a result, workers often incur overdraft fees, pay bills late and incur late fees, run up and maintain expensive credit card balances, and burden family and friends with requests for short-term cash needs.

2.     DailyPay provides a technological solution by providing workers with an employer-integrated on-demand pay ("ODP") product—also known as earned wage access

("EWA") in the industry—which enables workers to access more quickly the pay that they already have earned.  The money that DailyPay delivers to a worker ahead of the payroll schedule is the worker's money.  The worker has no obligation to repay DailyPay, and DailyPay has no legal or contractual recourse against the worker, ever, even in the event that the employer fails to make payroll.

3.    DailyPay partners with employers to offer its on-demand pay product to their workers and over 365,000 workers in New York have had access to DailyPay.  For those workers who choose to use DailyPay's on-demand pay product, DailyPay provides real-time information about their earnings and makes a portion of their earned pay available to them.  Workers can request an ACH transfer[1] of their earned pay at no cost.[2]  Or they can request an expedited instant transfer for a typical fee of $3.49, much like an Automated Teller Machine ("ATM") fee for an out-of-network withdrawal.  Transfers are settled through the usual employer payroll process.

4.    DailyPay's employer-integrated ODP product gives New York workers the ability to handle unexpected expenses without resorting to high-cost financial liquidity solutions, such as individual savings or checking account overdraft programs, which may require a typical $35 fee per transaction.[3]  Without DailyPay, many workers would not be able to pay rent on time, feed their families, fix a broken heater, pay for a needed car repair, or take a taxi to the hospital. Using DailyPay, workers are able to better manage their finances and avoid costly short-term

---

[1] An ACH, or automated clearing house, transfer typically takes one business day for the funds to arrive in the worker's account depending on the settlement policies of the worker's financial institution.

[2] For eligible workers, DailyPay also offers an optional general purpose reloadable prepaid card account to which instant transfers can be made at no cost if direct deposit is also set to the card.

[3] *See* Overdraft Lending: Very Large Financial Institutions, 89 Fed. Reg. 106768 (Dec. 30, 2024).

credit options.  Studies have shown that employer-integrated earned wage access solutions like DailyPay help workers transition away from more expensive alternatives.  One study found that, on average, previously-frequent overdraft users save $660 a year by using DailyPay—a significant savings for many workers.

5.      Despite the real benefits that DailyPay provides to New York workers, the OAG is threatening enforcement action against DailyPay as part of its market-wide and overbroad attempt to regulate the entire earned wage access industry.  In doing so, the OAG also ignores the New York State Legislature's efforts to set up an appropriate regulatory framework for the nascent earned wage access industry.  *See* 2025 NY Assembly Bill A258.  More critically, the laws that the OAG is relying upon do not apply to DailyPay at all.

6.      The OAG alleges that DailyPay's on-demand pay product is a loan that violates New York usury laws.  However, DailyPay's employer-integrated on-demand pay product is not a loan under New York law.  It does not charge interest.  DailyPay also does not advance future earnings.  Rather, DailyPay's employer-integrated model ensures that any transfer that a worker receives is money the worker already has earned and is entitled to.  It is the worker's money. The worker has no obligation to repay DailyPay and DailyPay has no legal or contractual recourse against the worker, ever, even in the event that the employer fails to make payroll.  New York law unambiguously does not treat such transaction as a loan.

7.      DailyPay's employer-integrated product differs from a loan in several other critical ways:  First, DailyPay does not check the creditworthiness of the worker, nor does it report any information to credit bureaus.  Second, there is no credit application or underwriting process required for the worker to be able to access his or her earned pay.  Third, there is no

interest or any other charge based on the amount of transfer or the length of time between transfer and payroll. Fourth, DailyPay does not engage in any debt collection against the worker.

8.    DailyPay also structures its product with consumers' interests in mind: First, DailyPay does not "estimate" the worker's earnings; rather, it allows the worker to access a portion of the real earnings the worker already has earned based on the real-time information DailyPay receives through the employer's payroll system. Second, the free transfer option and the expedited transfer option for a typical fee of $3.49 are prominently set out and easy for workers to understand and decide which option to choose. DailyPay does not seek or charge any other fee. Third, DailyPay prefunds the entire amount of the worker's remaining pay on or prior to the payroll date, and DailyPay is paid only when the employer processes payroll per the normal schedule. This means that DailyPay bears the risk of non-payment by the employer not only for any mid-cycle transfers but also for the worker's entire net paycheck.

9.    DailyPay's employer-integrated on-demand pay product is not a loan. Because of the fundamental flaw in the OAG's legal theory, which assumes the product is a loan, the OAG's threatened enforcement against DailyPay is untenable. DailyPay seeks a declaratory judgment that DailyPay is not a loan under New York law and does not violate federal and state laws that the OAG alleges.

## THE PARTIES

10.    Plaintiff DailyPay, LLC is a limited liability company organized under the laws of Delaware, with its principal place of business in New York, New York. DailyPay, LLC has one member, DailyPay Holdings, Inc., which is incorporated in Delaware with its principal place of business in New York.

11.     Defendant Letitia James is the Attorney General of the State of New York.  She is sued in her official capacity.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

13.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims arising under state law.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to DailyPay's claims occurred in this District.

**STATEMENT OF THE CASE**

**A.     DailyPay's Business Model**

15.     DailyPay offers an employer-integrated on-demand pay or "ODP" product, which means DailyPay partners with employers to offer access to earned pay to their workers. DailyPay's ODP product is not available to the general public.

16.     When an employer partners with DailyPay, DailyPay integrates with the employer's payroll system, which enables DailyPay to access real-time earnings information for workers who choose to sign onto DailyPay's free mobile application.  DailyPay then calculates how much pay a worker has earned and, upon request, makes a portion of the pay available to the worker, taking into account deductions and withholdings.  As a result, any transfer a worker requests is only for money the worker already has earned and is entitled to.

17.     The worker can request a no-cost transfer that will be processed via ACH and typically will arrive within one business day depending on the settlement policies of the worker's

financial institution.  Alternatively, the worker can request a transfer that will be processed via debit push, Real Time Payments, or another equivalent payment system and will arrive immediately, for a typical expedited transfer fee of $3.49.  Unlike ACH transfers, which are typically processed by the clearing house in batches only on business days, expedited transfer systems typically process requests instantly, 24/7, and on a request-by-request basis.  If the worker chooses the expedited option, the worker promptly receives the amount requested minus the expedited transfer fee.  Either way, DailyPay promptly initiates the requested transfer and the time difference is solely due to the settlement process of the worker's chosen payment system.

18.     When the worker chooses between the two delivery options, DailyPay's app clearly displays the no-cost nature of the ACH transfer and the fee charged for the expedited transfer.  *See* Figure 1.  The options are displayed in equal prominence and DailyPay does not pre-select an option or set a default option.  When the worker chooses the expedited transfer option, the fee charged for the transfer is clearly displayed again.  *See* Figure 1.



*Figure 1*

19.    The transfer to the worker is settled through the employer's payroll process, rather than by debiting the worker's bank account.

20.    The transfer does not create a debt obligation to DailyPay and the worker has no obligation to repay DailyPay.  DailyPay also has no recourse against the worker, which means that, in the event that an employer fails to make payroll or fails to process payroll through DailyPay, DailyPay has no legal or contractual right to obtain repayment from the worker and does not engage in debt collection against the worker.

21.    For any remaining net pay due to the worker, i.e., the amount of pay due after adjusting for withholdings, garnishments, and other deductions, and after subtracting any pay the worker already has requested and received, DailyPay typically prefunds the remaining net pay, usually a day before the payroll date, so that the worker receives his or her full remaining pay on the payroll date.  The remaining net pay that DailyPay prefunds often arrives in the morning of payroll date, hours before the worker otherwise would have received the pay from the employer without DailyPay.

**B.    DailyPay Provides A Crucial Financial Lifeline to New York Consumers**

22.    DailyPay offers a straightforward and easily understandable product.  Workers can always access their earned pay at no cost and receive the transfer via ACH, typically in one business day.  If workers have more immediate needs, they can elect an expedited transfer for a flat fee, typically $3.49.  Workers electing this expedited option always will know the exact amount of fee being charged prior to proceeding with the transfer.  The transparent flat fee is familiar to consumers; it is similar to the one-time fees they may pay to access their money through ATM cash withdrawals, Venmo instant transfers, and other similar products already available to consumers.

23.     Because of this simple and familiar model, workers can choose the option that best suits their needs.  There is no hidden cost.  For example, there is no cap on the amount of transfer that would require workers to make multiple transfers to meet their cash needs.

24.     These features set DailyPay apart from available alternatives.  Credit cards come with interest rates and cycles of debt that may be difficult for consumers to calculate.  Overdraft fees, typically at $35 for each transaction, are more expensive for consumers and often assessed without warning.  Moreover, these alternatives carry potential downstream risks that DailyPay's product does not.  Credit card use can adversely affect consumers' credit scores and overdraft programs can lead to involuntary account closures and have long-term effects on consumers' access to banks.  In contrast, DailyPay does not place consumers in debt and does not let consumers reach beyond their means, because the money it transfers is the money the worker already has earned.

25.     Employer-integrated on-demand pay products, such as DailyPay, help consumers bridge the gap between when they incur expenses and when their payroll is scheduled.  DailyPay cannot solve for income insufficiency or high costs of living, but by providing workers with access to their own earned wages, it can and does provide workers with access to a liquidity solution that can greatly improve their financial health.  DailyPay's app also offers various financial health services that provide workers with greater insight into their finances and help them better manage their finances.  Studies have shown that DailyPay helps workers reduce their reliance on more expensive and predatory financial solutions, and by extension avoid potential downstream effects on their credit scores and ability to bank.

26.    A study commissioned by DailyPay and conducted by Aite-Novarica Group[4] found that DailyPay helps workers pivot away from payday loans and overdrafts, reduce their debt, and pay their bills on time.  95% of study respondents reported that they stopped or reduced their use of payday loans after using DailyPay and 88% credited DailyPay for this change.  97% of the study respondents reported reduced use of overdraft programs and 79% of the respondents reported that they rarely or never used overdraft programs after using DailyPay.  75% of the study respondents credited DailyPay for this change.

27.    The Aite study respondents also reported being able to better manage their bill and loan payments and worry less about money.  The study found that, before using DailyPay, the majority of DailyPay users (who are mostly hourly workers) paid bills late, overdrew their accounts, and took out payday loans.  Aite estimates that, after using DailyPay, previously-frequent payday borrowers saved between $624 and $930 per year and previously-frequent overdrafters saved $660 a year.  For many DailyPay users earning low five figures a year, such savings could mean the difference between being able to afford an unlimited MetroCard or emergency childcare and suffering the consequences of losing transportation or childcare.

28.    Other third-party studies commissioned by DailyPay have come to similar conclusions.  They found that DailyPay had a positive influence on workers' financial habits and allowed workers to pay fewer overdraft fees and late fees.  Because of DailyPay, workers are able to budget better and improve their financial wellbeing.

29.    DailyPay's model—ACH delivery at no cost and expedited delivery for a flat fee—gives workers the ability to make transfers that fit their needs.  The ACH transfer option gives workers a free tool to alleviate their financial stress and allows them to reduce debt and

---

[4] *See* DailyPay Is A Payday Killer and An Overdraft Eliminator (last accessed Mar. 31, 2024), https://www.dailypay.com/aite-report/.

budget for expenses.  In 2024, approximately 34,318 New York workers transferred approximately $73,485,464 at no cost in total across approximately 536,694 transfers.  This means these workers received $2,141 on average during the year at no cost, enabling them to meet financial needs that otherwise could have forced them to incur overdraft fees or penalties for late payments.

30.    Similarly, the expedited transfer option provides workers with an alternative to more expensive financial solutions to short-term cash flow problems.  Transfer data show that when workers opt for an expedited transfer, they often are responding to a specific bill or expense and they transfer a specific or unique amount that corresponds to the amount of that bill or expense, rather than a round number amount.  In 2024, the most common expedited transfer amounts were between $100 and $105.  Around 70% of the optional expedited transfers were for amounts equal to or more than $50 and around 37% of optional expedited transfers were for amounts equal to or more than $100.  The expenses such transfers represent could have meant an unpaid utility bill, an unfilled prescription, or a skipped trip to the grocery store.

**C.    The OAG's Threatened Enforcement**

31.    Since the introduction of earned wage access, legislatures and regulators on both the federal and state levels have been reviewing industry practices and many, recognizing the benefits that earned wage access brings to consumers, have been considering rules and regulations that would standardize certain industry practices while preserving the availability of EWA products.  Given the complexity of the issues, most of the legislatures and regulators are still in the process of deliberation and have not enacted definitive laws and regulations.  This includes the New York Legislature, which has a pending bill that would set up a regulatory framework for earned wage access.

32.     In or around 2022, the OAG commenced an inquiry into the EWA industry and issued subpoenas to companies providing earned wage access, including DailyPay.  DailyPay cooperated with the inquiry and, over the past two and half years, provided the OAG with extensive information about its business operation and historical transfer data for its on-demand pay product.  DailyPay provided documents and testimony showing that workers have no obligation to repay the transfers they requested and that DailyPay is not providing loans to the workers.

33.     Nonetheless, the OAG has elected to designate itself as both legislator and regulator in the absence of applicable laws and regulations and, in effect, has declared all EWA products to be illegal regardless of their business model.

34.     On January 22, 2025, the OAG issued a "Five-Day Notice" under New York Executive Law § 63(12) and Articles 22-A and 23-A of the New York General Business Law, asserting that DailyPay's product is a loan that violates state usury laws and wage assignment laws by charging interest beyond the statutory limit.  The OAG further claimed that DailyPay violated federal and state consumer protection laws by, *inter alia*, advertising that DailyPay does not charge any interest and that workers can obtain funds at no cost.  The OAG also asserted that DailyPay interfered with consumers' ability to understand that its product was a short-term loan with interest and to compare the cost of DailyPay's product against other financial products.  The Notice stated that the OAG "intend[ed] to commence litigation … against DailyPay to obtain injunctive relief, restitution, damages, disgorgement, civil penalties, an accounting, costs, and such other relief as the court may deem just and proper."  The OAG granted an extension to its Five-Day Notice, so that DailyPay could have an opportunity to meet with the OAG on February 25, 2025, to explain why the OAG should not proceed with its threatened enforcement action.

Following that meeting, OAG has persisted in its position and, as of the drafting of this Complaint, has refused to withdraw its Five-Day Notice. It has indicated that it will forebear in filing suit against DailyPay, but only until April 4, 2025.

35.    The OAG's position is fundamentally flawed because DailyPay does not violate any federal or state law because its product is not a loan under New York law and therefore DailyPay has not misrepresented its product or their features to consumers.

36.    The OAG's threatened litigation has affected DailyPay's business. It has affected DailyPay's financial position and planning and caused DailyPay to incur costs associated with responding to the OAG's investigation and threatened lawsuit, including planning for a potential exit of its core on-demand pay product from the state of New York.

**C.    DailyPay's On-Demand Pay Product Is Not A Loan**

37.    DailyPay's on-demand pay product is not a loan under New York law and therefore DailyPay's product does not violate the federal Consumer Financial Protection Act and the state statutes.

38.    To determine whether a transaction is a loan under New York law, "[t]he court must examine whether the plaintiff is absolutely entitled to repayment under all circumstances." *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 665–66 (2d Dept 2020) (cleaned up); *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914) ("In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use."); *In re Renshaw*, 222 F.3d 82, 88 (2d Cir. 2000) (citing *Grand Union* as providing the "classic definition of a loan").

39.     Workers do not have an absolute obligation to repay DailyPay.  They in fact have *no* obligation to repay DailyPay at all.  DailyPay makes available pay that the worker already has earned and is entitled to.  As such, DailyPay's ODP product is more akin to an ATM, which provides money that belongs to the user and that the user has no obligation to repay (because it is already the user's own money).

40.     DailyPay's Program Terms, which serves as the basis for the relationship between DailyPay and the worker, plainly provides that the worker is *not* obligated to repay DailyPay, even if DailyPay is not paid by the employer.  Specifically, the Program Terms states that "if [the employer] pays [DailyPay] an amount that is less than [what DailyPay has transferred to the worker]—for example, if the [employer] is unable to make payment because its business has slowed down or closed in the ordinary course of business—then [the worker] will owe [DailyPay] nothing."  DailyPay also has no recourse against the worker for transfers the worker has already received, regardless of the reason why DailyPay is not paid by the employer.

41.     DailyPay operates according to its Program Terms.  It incurs millions of dollars in operational losses every year when employers delay or fail to make payment or when workers are overfunded due to employer data errors.  It has no recourse and does not attempt to take any recourse against the worker even in cases where the worker fails to authorize payroll settlement through DailyPay.  This is because, following a transfer, DailyPay assumes from workers the risk of the employer not making payroll on the payroll date.  The worker, in contrast, already has been paid and faces no such risk.

42.     Under New York law, when a transaction does not appear to be a loan from its written papers, courts require clear and convincing evidence that it is a loan.  *In re Grand Union Co.*, 219 F. at 357 ("[T]he evidence to prove a transaction to be different from what it appears to

be from the written papers, as to show an absolute deed to be a mortgage, or a transaction fair on its face to be usurious or otherwise illegal, must be clear and convincing."); *Zhavoronkin v. Koutmine*, 52 A.D.3d 597, 598 (2d Dept 2008) ("There is a strong presumption against a finding of usury, and, at trial, the defendant was required to establish usury by clear and convincing evidence"); *Freitas v. Geddes Sav. & Loan Ass'n*, 63 N.Y.2d 254, 261 (1984) ("Clear and convincing evidence, of an act unequivocally exacting a rate of interest in excess of that allowed by law, places a transaction within the plain intent of the usury statute.") (cleaned up).  The OAG cannot meet this high standard.

43.    "Generally, several factors should be considered, including the intent of the parties, which is inferable from the language of the contracts, the presence or absence of interest, and the parties' tax treatment of the payment."  *People ex rel. Spitzer v. Grasso*, 13 Misc. 3d 1227(A) (N.Y. Sup. Ct. 2006).

44.    DailyPay does not intend the transfer to be a loan and the Program Terms clearly state that it is not intended to create any debt obligation owed by a worker.  Workers do not consider DailyPay's product a loan, because the money transferred—both the pre-payroll transfers and the remaining net pay which DailyPay prefunds before the employer processes payroll—already belongs to them and they rightly understand the transfers they receive as part of their pay.  There is no interest that is calculated based on the amount or timing of a transfer. DailyPay's product also lacks other characteristics of a loan:  DailyPay does not require any credit application from workers to obtain transfers, does not check workers' credit scores or other consumer reports, does not require any credit underwriting or approvals of workers, does not debit workers' bank accounts for automatic repayment, does not engage in any collection activities against workers, and does not report to credit bureaus.

45.    New York courts have routinely found that arrangements lacking repayment obligations are not loans.  For instance, in *Matter of Smith*, the Second Department upheld the assignment of the remainderman's interest in a trust and found that it was not a loan because "the assignments would be payable only by the estate" and the assignor could not "be held liable in any event."  280 A.D. 947, 947–48 (2d Dept 1952), *aff'd*, 305 N.Y. 764 (1953).  Similarly, in *Cash4Cases, Inc. v. Brunetti*, the First Department found that the purchase of contingent proceeds from a pending personal injury action was not a loan because "defendant received funds with no guaranteed obligation to repay, except from the proceeds, if any, recovered in his personal injury action."  167 A.D.3d 448, 449 (1st Dept 2018).  Consistent with these cases, DailyPay's transfers to workers are settled only by their employers and the workers are not held liable for their employers' nonpayment.

46.    That DailyPay's product is not a loan is also consistent with the longstanding New York law that payments employers make to their employees without an obligation to repay are not loans.  *See, e.g.*, *NorthWinds Renewables LLC v. Rheuben*, 42 Misc. 3d 135(A), 984 N.Y.S.2d 633 (1st Dept App. Term 2014).  Indeed, access to earned pay is already being provided by some large, technologically-advanced New York employers without threat of investigation or suit by the OAG.  Treating DailyPay's product differently from these companies' services is legally indefensible and economically inefficient.  A transfer of earned pay cannot become a loan simply because an employer offers the service using DailyPay's platform.

47.    The fee DailyPay charges for the *optional* expedited transfer is not interest under New York law.  New York courts have held that if fees are charged "beyond the borrower's control," they may be considered as interest.  *See, e.g.*, *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 183 (1st Dept 2013).  Here, however, workers retain sole

discretion over whether they want to opt for a free ACH transfer or an expedited transfer that requires a flat fee.

48.     Even within the context of the Truth in Lending Act ("TILA"), courts have found that when a fee is not "incident to, or a condition of," the loan, it is not a finance charge under TILA (as defined in 12 C.F.R. § 1026.4 to include both interest and other charges) and is not subject to disclosure requirements.  *See Veale v. Citibank*, 85 F.3d 577, 579 (11th Cir. 1996) (charge for optional expedited delivery of loan proceeds not a finance charge); *Pechinski v. Astoria Fed. Sav. & Loan Ass'n*, 238 F. Supp. 2d 640, 643 (S.D.N.Y. 2003) (citing *Veale*), *aff'd*, 345 F.3d 78 (2d Cir. 2003).  The fee DailyPay charges for the optional expedited transfer is not incident to or a condition of the transfer, as workers always have the option of making the transfer at no cost.

49.     Moreover, for any fee to be interest, the fee must "not actually reimburse [DailyPay] for expenses associated with" the transfers.  *LG Cap. Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 WL 3437973, at *10 (E.D.N.Y. July 29, 2019), *report and recommendation adopted*, No. 17CV1297NGGSJB, 2019 WL 4564882 (E.D.N.Y. Sept. 20, 2019).  DailyPay incurs direct per-transfer costs for both ACH transfer and expedited transfer and the fee it charges for the optional expedited transfer is the only fee DailyPay charges for its on-demand pay product.  The optional expedited transfer fee therefore is a "reasonable expense" that does not "render[] [DailyPay's product] usurious."  *See Durante Bros. & Sons v. Flushing Nat. Bank*, 652 F. Supp. 101, 105 (E.D.N.Y. 1986).

50.     Accordingly, DailyPay's product is not a loan and the fee for the optional expedited transfer is not interest.

**D.    DailyPay Does Not Violate the Federal Consumer Financial Protection Act or New York General Business Law**

51.    The OAG has alleged that DailyPay violates the federal Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*, and New York General Business Law §§ 349 and 350 by failing to market its ODP product as a loan with interest.  The OAG also has alleged that DailyPay further violates the federal Consumer Financial Protection Act by interfering with consumers' ability to compare cost of credit by failing to disclose an interest rate, by encouraging repeated use of DailyPay's product, and by taking advantage of consumers' reliance on their employers' identification of DailyPay as a benefit.

52.    These alleged violations all depend on the OAG's flawed assumption that DailyPay's ODP product is a loan.

53.    For all the reasons explained above, DailyPay's ODP product is not a loan because it does not impose on workers an absolute obligation to repay.  *See supra* ¶¶ 37–46.  By extension, it does not extend credit to the workers and does not charge a cost of credit.  In any event, even under TILA and Regulation Z, any finance charge under $5 is deemed *de minimis* and need not be disclosed in the form of an annual percentage rate ("APR").  *See* 12 CFR 1026.18(e).

54.    The OAG also has no basis for its allegations that DailyPay misled consumers about the cost or function of its product.  DailyPay clearly explains in all its communications to workers how its product works and the fee it charges for the optional expedited transfer.  It enables workers to decide whether they receive any notifications about their earned pay and does not "push" the users to make a transfer or to select one transfer option over another.

55.    Accordingly, DailyPay does not violate the federal Consumer Financial Protection Act and New York General Business Law.

E.    **DailyPay Does Not Violate New York Usury Laws**

56.    The OAG alleges that DailyPay violates New York usury laws by offering a loan with usurious interest rates.  "The rudimentary element of usury is the existence of a loan or forbearance of money, and where there is no loan, there can be no usury."  *LG Funding, LLC*, 181 A.D.3d at 665.  Because DailyPay's ODP product is not a loan, there can be no usury.  *See supra* ¶¶ 37–46.

57.    Further, because the fee for the optional expedited transfer is not interest, DailyPay does not charge any interest, much less usurious interest, even if its product is deemed a loan.  *See supra* ¶¶ 47–49.  "[A] borrower may pay reasonable expenses attendant on a loan without rendering the loan usurious."  *Lloyd Cap. Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127 (1992).  Here, the fee for the optional expedited transfer is a reasonable expense that reimburses the costs DailyPay incurs to process both ACH transfer and expedited transfer and to make the ODP product available to New York workers.

58.    Accordingly, DailyPay does not violate New York usury laws.

F.    **DailyPay Does Not Violate New York Wage Assignment Laws**

59.    The OAG asserts that DailyPay violates Section 46-F of the New York Personal Property Law, which provides in pertinent parts that "no person shall directly or indirectly receive or accept . . . for the use and sale of his personal credit or for making or continuing any advance or loan of money (1) in anticipation of earnings assigned outright, or (2) on the security of an assignment of any earnings assigned as security, a greater sum than at the rate of eighteen per centum per annum on the amount of such loan or advance[.]"  N.Y. Pers. Prop. Law § 46-f.

60.    DailyPay does not violate Section 46-F because the plain text of the provision is limited to conditions on "making or continuing any *advance* or *loan* of money."  As detailed above, DailyPay's ODP product is not a loan.  *See supra* ¶¶ 37–46.

61.    DailyPay's product also is not an advance.  New York law distinguishes "advances" from "earned wages."  *See Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 297 (E.D.N.Y. 2013); *Pachter v. Bernard Hodes Grp., Inc.*, 10 N.Y.3d 609, 617 (2008).  DailyPay offers workers access only to the wages they already have earned.  By contrast, advances are contingent or unearned amounts.  *See, e.g.*, *4Kids Ent., Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 247 (S.D.N.Y. 2011) (defining advance as "the furnishing of money . . . before any consideration is received in return"); *Random House, Inc. v. Gold*, 464 F. Supp. 1306, 1310 (S.D.N.Y. 1979) (describing advance provided in anticipation of delivering a completed manuscript), *aff'd*, 607 F.2d 998 (2d Cir. 1979).

62.    Moreover, the legislative history of Section 46-F confirms that Section 46-F is not concerned with products like DailyPay's but instead with loans secured by wage assignments.

63.    New York's wage assignment laws are codified in Article 3-A of the New York Personal Property Law, which was first enacted in 1904 by "An Act to require *lenders of money on salaries of employees* to file with employers a copy of agreement or assignment under which claim is made."  *Sistenstein v. Manufacturers Hanover Fin. Servs. of New York, Inc.*, 138 Misc. 2d 140, 142 (Sup. Ct. 1988); L 1904, ch 77 (emphasis added).  In 1911, the section was amended to add, among other things, the first iteration of Section 46-F by "An Act to amend to personal property law, relative to *lenders of money on salaries*."  L 1911, ch 626 (emphasis added).  In 1950, the wage assignment laws were consolidated in Article 3-A of the New York Personal Property Law at the recommendation of the Law Revision Commission.  As recommended by the Law Revision Commission, Section 46-F combines subdivisions 5 and 6 of Section 42, "prohibiting the receipt of interest or charges exceeding 18 per cent for *loans secured by wage assignment*," and "restricts the interests and charges which may be received upon *a loan secured*

*by an assignment of wages*."  Mem. by the Exec. Sec'y and Dir. Of Research of the Law Revision Comm'n at 4, 7, Bill Jacket, L 1950, ch 823 (emphasis added).  The statutory note included in the Senate bill similarly states that Section 46-F "restrict[s] the rate of interest and other charges on *assignment of future or accrued earnings securing loans*."  1950 NY Senate Bill S110 (emphasis added).  Additional authorities further confirm that Section 46-F is intended to apply to loans secured by wage assignments.  *See, e.g.*, *Bond v. Dentzer*, 494 F.2d 302, 308 (2d Cir. 1974) ("Section 46-f limits the amount of *interest collectable on a loan* and bars other charges disguised as investigative costs or charges for the drawing of papers.") (emphasis added).

64.     DailyPay's ODP product is not a loan or advance.  Nor is it secured by a wage assignment.  When a worker receives a transfer of his or her pay from DailyPay, the worker is getting paid for his or her work, and DailyPay's payroll-integrated settlement mechanism naturally ensures that a worker does not receive double-payment for his or her work.  The worker has no obligation to repay the transfer.  And DailyPay does not have any right to seek repayment from the worker in the event that the worker declares bankruptcy.

65.     The "[o]bjective" of Article 3-A is to "provide safeguards for the wage earner, so that overreaching him is made difficult" but "[a]t the same time the law should be not so stringent that no one will lend money or extend credit on the security of an assignment of wages[.]"  Recommendation of the Law Revision Comm'n to the Leg. at 1, Bill Jacket, L 1950, ch 823.  Because DailyPay only transfers to workers what they already have earned, there is no potential for a worker overreaching beyond his or her actual earnings.  On the other hand, using Section 46-F to restrict DailyPay—as the OAG proposes to do—would interfere with workers'

ability to access their own money, their earned pay, the opposite of what the Legislature intended.

66.    DailyPay's ODP product does not meet the predicate elements of Section 46-F and therefore does not violate Section 46-F.

## **FIRST CLAIM FOR RELIEF**

(Declaratory Judgment)

67.    Plaintiff repeats and re-alleges the foregoing paragraphs.

68.    A real and justiciable controversy exists over whether the events set forth above were lawful, or, as DailyPay contends, constituted violations of DailyPay's rights.  DailyPay contends that DailyPay's product does not constitute a loan under New York law and accordingly, the OAG's threatened enforcement action unlawfully restricts and renders uncertain DailyPay's ability to conduct business in the state of New York.  The OAG's threatened enforcement has affected DailyPay's financial position and planning and caused DailyPay to incur costs associated with responding to the OAG's investigation and threatened enforcement action, including planning for a potential exit of its core on-demand pay product from the state of New York.

69.    DailyPay's representations and disclosures to workers do not violate the federal Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*, or New York General Business Law §§ 349, 350.

70.    Identifying DailyPay as a benefit in communications from employers and DailyPay to workers does not violate the federal Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*

71.    DailyPay's product does not violate New York usury laws, General Obligations Law § 5-501, or Penal Law § 190.40.

72.    DailyPay's product does not violate New York Personal Property Law § 46-F.

73.    A judicial declaration is necessary and appropriate to prevent further injuries caused by the OAG's threatened enforcement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully seeks the following relief:

1.    A declaration that DailyPay does not violate federal Consumer Financial Protection Act, 12 U.S.C. § 5531 *et seq.*, New York General Obligations Law § 5-501, New York Penal Law § 190.40, New York Personal Property Law § 46-F, and New York General Business Law §§ 349, 350.

2.    Any and all such relief as the Court may deem appropriate.

Dated: New York, New York
April 7, 2025

ARNOLD & PORTER KAYE SCHOLER
LLP

By:  */s/ Marcus A. Asner*
      Marcus A. Asner
      Yiqing Shi
      250 W. 55th Street
      New York, NY 10019-9710
      Tel: 212.836.8000
      Fax: 212.836.8689
      marcus.asner@arnoldporter.com
      yiqing.shi@arnoldporter.com

      Meredith Osborn
      Three Embarcadero Center 10th Floor
      San Francisco, CA 94111-4024
      Tel: 415.471.3140
      meredith.osborn@arnoldporter.com

      PAUL, WEISS, RIFKIND, WHARTON &
      GARRISON LLP

      Loretta E. Lynch
      Yahonnes Cleary
      1285 Avenue of the Americas
      New York, NY 10019
      Tel: 212.373.3000
      lelynch@paulweiss.com
      ycleary@paulweiss.com

      *Attorneys for Plaintiff DailyPay, LLC*